[No. 1804]

THE STATE OF NEVADA, EX REL. THE HENDERSON BANKING COMPANY, A CORPORATION, RELATOR, *v.* J. A. McBRIDE AND H. S. TABER, ET AL., RESPONDENTS.

1. SCHOOLS AND SCHOOL DISTRICTS—TRUSTEES—AUTHORITY.
   The jurisdiction of school district trustees is limited to the legislative authority conferred upon them.

2. COUNTIES—COUNTY COMMISSIONERS—AUTHORITY.
   The jurisdiction of county commissioners is limited to the legislative authority conferred upon them.

3. SCHOOLS AND SCHOOL DISTRICTS—BONDS—TAX LEVIES.
   Under the act of March 6, 1907, authorizing a school district to issue bonds to build a schoolhouse, under section 8, limiting annual levies on account of the bonds to $1,000, under the act of March 12, 1907, as amended by the act of February 8, 1908 (sec. 2), authorizing school districts to issue bonds to build school buildings, and under section 7, requiring annual levies to redeem the bonds to be equal, a school district cannot issue bonds maturing at the rate of $1,000 annually for the first eight years and at the rate of $1,500 during the remaining eight years.

4. MANDAMUS—SUBJECTS OF RELIEF—ISSUANCE OF BONDS.
   *Mandamus* will not lie to compel officers to execute bonds not in accordance with law.

ORIGINAL PROCEEDING. *Mandamus* by the State of Nevada, on the relation of the Henderson Banking Company, against

J. A. McBride and H. S. Taber, Chairman and Clerk of the Board of School Trustees of Elko School District. **Writ denied.**

The facts sufficiently appear in the opinion.

*Lewers & Henderson*, for Relator:

The only issue that is apparent, or which has been called to our attention, is whether the scheme of redemption of the bonds authorized by the trustees and the voters of the district invalidates the issue. The bonds as authorized are for $20,000, to be redeemed at the rate of $1,000 a year for the first eight years and $1,500 a year for the next eight years, so that the entire issue would be taken up in sixteen years. Section 7 of the act under which the bonds were issued provides that the commissioners shall raise annually a sum "sufficient to pay annually a proportion of the principal of said bonds equal to a sum produced by taking the whole amount of said bonds outstanding and dividing it by the number of years said bonds then have to run." It then provides that this shall be known as a "sinking fund," and shall be used in paying off the bonds. It is contended that this provision of the statute makes it necessary that an equal amount should be redeemed every year, in our case $1,250. It is respectfully submitted that this contention is not well made, for the following reasons:

Sections 2 and 3 of the act of 1908 authorize the trustees to make a proposal to the voters fixing the amount and denomination of the bonds and the number of years, not exceeding twenty, they are to run. Section 4 authorizes the trustees after the election to issue the bonds "in such form and denomination as the board of trustees may direct." Under these sections the trustees are not compelled to adopt any one style of bond. They might make all the bonds redeemable in twenty years from issue; they might make them all run for twenty years and pay installments on each bond every year; they might provide for retiring one or more bonds every year or at intervals of several years; they can fix the number and denomination of the bonds in any form they see fit within the established limits; and they may fix the inter-

est at any figure not exceeding eight per cent. In short, they are vested with a wide discretion as to the form and manner of payment of the bonds. Section 7, defining the duty of the county commissioners, is intended, not as a check on the trustees, but as a direction to the commissioners to provide funds for redemption of the bonds. No matter what scheme is adopted by the trustees, within the lines indicated·above, there would be a sinking fund on hand to pay the bonds in full at the end of the time set.

No question is raised here as to the power of the district to issue the bonds, but merely as to their form. An examination of the entire statute does not reveal any legislative intent to restrict the trustees to any particular method of redemption. The trustees are given discretionary powers within certain limits as to the total time, amount and interest, and the commissioners are directed to collect a tax sufficient to pay off any form of bonds within these limits. In this connection it is significant that the statute provides that the tax for redemption shall go into a sinking fund. A sinking fund is an accumulated and accumulating fund to be drawn on in the future. If it had been the purpose of the legislature to require this amount to be at once paid out in full each year as soon as collected, other language would have been employed. Even if we could be satisfied from an inspection of the entire statute that the legislature had in mind the retiring of an .equal amount of the bonds every year, it is still apparent that this was not made mandatory. There is nothing to indicate that a strict compliance was deemed essential. In this connection the following language of Judge Cooley, quoted with approval by Chief Justice Hawley in *Odd Fellows Bank* v. *Quillen*, 11 Nev. 114 (a bond case), is directly applicable: "Those directions, which are not of the essence of the thing to be done, but which are given with.a view to the proper, orderly and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient if that which is done accomplishes the substantial purpose of the statute."

Following this quotation, Justice Hawley adds: "In determining this question, as well as every other that involves a construction of the statute, we must carry into effect the intention the legislature had in view in adopting it, in order to secure, if possible, the object intended to be secured by the statute. It will be observed that no negative words are used which forbid the detaching of the coupons from the bonds by any other person than the treasurer. We think it is clear that the legislature, in adopting the provision, inserted the clause requiring the treasurer to detach the coupons as a mere matter of form." This language is directly to the point we are now considering. No negative words are employed in the act of 1908 to the effect that an equal amount must be redeemed each year. The scheme adopted by the trustees and voters accomplishes the substantial purpose of the statute and the proposed bonds are therefore legal in every respect. We do not find in this statute or in any other statute concerning taxation or the duties and powers of county commissioners or treasurers anything prohibiting the accumulation of special funds from year to year. On the other hand, the right to accumulate is clearly recognized. Section 2324 of the Compiled Laws requires the treasurer to deliver to his successor all public moneys in his possession. Section 1207 requires him to keep all moneys received by him until paid out on proper order. Section 1224 provides that a redemption fund shall be set aside and kept for the payment of any special outstanding indebtedness. And section 2133 prohibits the interference with any such special fund.

There is therefore nothing to prevent the treasurer of Elko County from receiving annually the sum of $1,250, putting it into the sinking fund created by the act of 1908, and paying it out at the rate of $1,000 a year for the first eight years and $1,500 a year for the second eight years. The right to issue bonds substantially complying with the law, even though technically assailable, has been definitely recognized by respectable authority.

Thus, where a municipality is authorized to issue bonds between certain denominations, bonds of any other denomination not exceeding the limits are good, without regard to the

denomination mentioned in the proposal. (*Greene County* v. *Daniel*, 102 U. S. 87; *Turner* v. *Woodson County*, 27 Kan. 314.)

Under authority to issue bonds payable in fifteen years from the date of the statute, bonds issued four years after and made payable in eleven years were held valid. (*Gilchrist* v. *Little Rock*, 1 Dill. 261.)

And where bonds were authorized for thirty years, bonds payable in thirty years and thirty-five days, with interest for thirty years only, were held good. (*Rock Creek* v. *Strong*, 96 U. S. 271.)

And it is no objection to bonds that interest is made payable semi-annually, though the proposition was for interest payable annually. (*Commissioners* v. *Clark*, 94 U. S. 278; *Wilson* v. *Neal*, 23 Fed. 129; *Myer* v. *Muscatine*, 1 Wall. 384.)

The peculiar nature of this case, depending so directly on the interpretation of our own statute, has made it impossible to find authorities directly in point. We believe, however, that those cited indicate that the substantial purpose of the statute must be sustained and kept in view, and that apparent departures from a strict interpretation of the statute must be disregarded as long as the legislature has not clearly shown that strict compliance is a condition precedent.

It is our contention, however, that the bonds we now ask to have signed, preparatory to registration and the other steps necessary for final issue, are legal even under the strictest construction of the statute, for the reasons indicated.

*Samuel Platt*, for Respondent.

By the Court, TALBOT, J.:

The relator seeks a writ of mandate commanding respondents, as chairman and clerk of the board of school trustees of Elko School District, to execute and tender certain bonds, the validity or invalidity of which would depend upon the following circumstances and enactments: The board ordered that the question of contracting a bonded indebtedness of $20,000 for constructing school buildings be submitted to the voters of the district at a special election, and in this connection recommended that bonds should be issued, forty in number, for $500

each, bearing 6 per cent interest, to be redeemed in sixteen years, at the rate of $1,000 annually for the first eight years, and $1,500 annually for the next eight years. At the election which followed, the proposition was carried by a vote of more than 100 to 1. Subsequently, and after a change in the personnel of the board, it was ordered that the bond issue so voted should be made, and after advertising for, and the presentation of, bids, it was ordered that the one submitted by relator, the same being for all the bonds at par, be accepted, and that the bonds be issued accordingly. Thereafter relator tendered to respondents, as chairman and clerk of the board, $20,000 in gold coin and requested that the bonds be executed and delivered, which was refused by respondents on the sole ground that the times and amounts of redemption provided in the resolution and notice and in the bonds were not in accordance with the law under which the bonds were voted.

In the act authorizing the trustees of Elko School District to issue bonds for the purpose of building a new schoolhouse, approved March 6, 1907, it is provided:

"Sec. 2. Said bonds shall be issued for sums not less than one hundred dollars each in gold coin, and shall be sold at not less than par value, and shall be payable to bearer, and the interest thereon shall be payable annually, and coupons of each installment of such interest shall be attached to each of said bonds.

"Sec. 3. The board of trustees of said school district are hereby authorized, when in their judgment they deem it advisable, to purchase suitable grounds, to build a new schoolhouse, or one or more schoolrooms for said district in addition to those now in use, to call an election for the purpose of providing means therefor. Such election shall be called in the manner provided by law for calling elections for the purpose of raising money for similar purposes in school districts, and if a majority of the votes cast at said election in said district by the persons qualified to vote at said election, shall vote to carry out the recommendations of said board of trustees, then the said board shall proceed to issue the bonds herein provided for in this act, but before doing so said board of trustees

shall certify the result of said election to the board of county commissioners of said county.

"Sec. 8.    To provide for the payment of the bonds herein authorized to be issued, the said board of county commissioners shall, in the year 1907 and annually thereafter, levy a special and additional tax upon all the property situated within said School District No. 1, sufficient in their judgment to raise the sum of one thousand dollars each year, which shall be assessed and collected the same as other taxes, paid to the county treasurer, and by him assigned to the general fund of said county.    At the maturity of said bonds, they shall be paid by the county treasurer out of the general fund of the county, upon the presentation and surrender of said bonds.    If the tax, so as aforesaid levied, for the redemption of said bonds, shall exceed the sum of one thousand dollars a year, whenever the aggregate amount of money so collected shall equal the full sum necessary to redeem said bonds the tax hereby authorized for such purpose shall cease, and should there be any excess over and above the amount required to carry out the provisions of this act, the amount of such excess shall be transferred to the school fund of said district.    Should the amount of said tax realized be less than the amount necessary for the redemption of said bonds, they shall, nevertheless, be redeemed and paid out of said general fund, as herein provided, and a special tax shall be levied by the county commissioners, upon the property within said school district for the year in which the last bond shall fall due, sufficient to cover said deficiency, which tax shall be levied, assessed and collected in the usual manner, and paid into the general fund of said county."    (Stats. 1907, pp. 93, 94, c. 47.)

The act approved February 8, 1908, has the following provisions:

"Section 1.    Any school district of the state now existing, or which may hereafter be created, is hereby authorized to borrow money for the purposes of erecting and furnishing a school building or buildings, or purchasing ground upon which to erect such school building or buildings, or for refunding floating indebtedness, by issuing the negotiable

coupon bonds of the district in the manner by this act provided.

"Sec. 2. When the board of trustees of any school district shall deem it necessary to incur an indebtedness authorized by this act by issuing the negotiable coupon bonds of the district, such board of trustees shall first determine the amount of such bonds to be issued, and a certificate of such determination shall be made and entered in and upon the records of said district. Thereupon, the board of school trustees shall, by resolution duly made and entered in and upon the records of said board, submit the question of contracting a bonded indebtedness for any of the purposes authorized by this act to a vote of the duly qualified electors of the district at the next general election of the school trustees, or at a special election which the school trustees are hereby authorized to call for such purpose.

"Sec. 7. * * * Beginning with the year the bonds are issued, and annually thereafter, until the full payment of said bonds has been made, the board of county commissioners of the county in which said school district is situated shall levy and assess a special tax, and shall cause said special tax to be collected on all property of the school district, including the net proceeds of mines, sufficient to pay annually a proportion of the principal of said bonds equal to a sum produced by taking the whole amount of said bonds outstanding and dividing it by the number of years said bonds then have to run, which amount shall be levied, assessed and collected in the same manner as the tax for the payment of the interest coupons, and when collected shall be known as the 'sinking fund,' and shall be used only in the payment of such bonds * * *."

It must be conceded as an elementary proposition that boards of school trustees and county commissioners are limited in their jurisdiction to the legislative authority conferred upon them. The question involved is whether the Elko school district was authorized by any statutory enactment to make or vote any bond issue which did not provide for the maturity and payment of the bonds in equal annual installments. As is sought to be done, is it legal for the district to make a bond issue for $20,000 to be redeemed at the

rate of $1,000 for the first eight years and at the rate of $1,500 for the next eight years? If so, it may be conceded that bonds in this amount could be issued maturing at the rate of $100 a year for nineteen years, and the balance of $18,100 payable on the twentieth year by future taxpayers, or that all of the principal of the bonds could be made payable on the sixteenth or twentieth year.

By scanning the statutes to see if such issue is warranted, it may be said that section 1 first above quoted fixes a maximum time of twenty years and amount of $20,000, either of which might be reduced by the district without stating whether any of the bonds issued might be made to mature in equal or unequal proportions annually. Seeking something more definite in relation to the authorization for the tax levy to meet the payment of the bonds which is most essential to their value and validity, the only levy authorized by section 8 of the first act mentioned is one for a special additional tax upon all the property in the district, sufficient in the judgment of the board of county commissioners to raise the sum of $1,000 each year. Hence the attempt to make part of the bonds payable at the rate of $1,500 per year is not authorized, and there is no provision in the act first mentioned, relating to the Elko school district, which would allow a levy for more than $1,000 annually. True, section 8 attempts to provide that, if the amount of the tax realized from this special levy in the district made for the purpose of retiring these bonds be less than necessary for the redemption, they shall nevertheless be redeemed and paid out of the general fund, and that a special tax shall be levied by the county commissioners upon the property within the school district for the year in which the last bond shall fall due, sufficient to cover such deficiency, which shall be paid into the general fund of the county. Without determining whether the money might not be borrowed from the general fund of the county temporarily to meet a deficiency caused by the amount collected from the district being less than had been estimated and expected by the board of county commissioners for the payment of the bonds maturing during any year, the impropriety and illegality of requiring the general fund of the

county to pay for several years the bonds maturing in excess of the amount for which any levy is authorized against the district is apparent. Otherwise, if the district could issue bonds to mature in amounts in excess of $1,000 annually as attempted here, it could provide that several thousand dollars should mature annually, only $1,000 of which could be collected from the district, and the general fund of the county would have to pay the remainder, and possibly a much larger amount yearly, toward retiring the bonds, than the school district, and the county would have to wait till the last of the bonds matured before it could be repaid, and then there is no provision by which it could receive any interest. As section 8 limits the levy in the district to $1,000 annually, it cannot be presumed that the legislature intended that the bonds should mature in a larger amount, and consequently to allow more than $1,000 of the bonds to mature annually would not be within the purpose and spirit of the act. The provision for payment of any deficiency from the general fund may have been intended to meet any possible shortage in a levy made by the board of county commissioners for the purpose of redeeming not more than $1,000 worth of the bonds annually.

Looking to the later act of March 12, 1907 (Stats. 1907, p. 106, c. 59), as amended February 8, 1908, section 1 authorizes any school district of the state to borrow money for the purpose of purchasing ground and erecting and furnishing school buildings. Section 2 and the following sections allow the board of trustees, subject to the election and will of a majority of the voters of the district, to issue bonds in any amount desired. Section 7 expressly provides that the county commissioners shall levy a special tax sufficient to pay annually a proportion of the principal of the bonds equal to the sum produced by taking the whole amount of the bonds outstanding and dividing it by the number of years the bonds then have to run. As the former act provides for an annual levy for $1,000 only, which would not be sufficient to retire $1,500 of the bonds, and as the later statute authorizes levies for the raising of equal amounts annually, it is apparent that respondents ought not be required to execute and deliver bonds which would mature at the rate of $1,000 annually during the first

eight years and at the rate of $1,500 annually during the next eight years.

We wish to be understood as considering the case only in reference to the application before us for a writ of mandate which will not lie to compel officers to execute bonds not in accordance with law.

The petition for the writ is denied.